# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,                                    Case No. 17-20652
                                                    HON. DENISE PAGE HOOD

v.

TIONNA MITCHELL,

     Defendant.

_____/

## ORDER GRANTING DEFENDANT'S
## EMERGENCY MOTION FOR IMMEDIATE REDUCTION OF
## SENTENCE (COMPASSIONATE RELEASE) [#56]

## I.    INTRODUCTION

Presently before the Court is Defendant Tionna Mitchell's ("Mitchell")

Motion for Compassionate Release, filed on April 27, 2020. [ECF No. 56] The

Court will construe Mitchell's requested relief as a Motion for Compassionate

Release under 18 U.S.C. § 3582. On April 30, 2020, the Court appointed the

Federal Community Defender to represent Mitchell. Mitchell filed supplemental

briefs on May 5, 2020 [ECF No. 61] and on May 21, 2020. [ECF No. 67] The

Government filed a Response [ECF No. 62] on May 15, 2020. On May 17, 2020,

Mitchell filed a Reply. [ECF No. 65] On June 25, 2020, Mitchell submitted

supplemental materials explaining that Mitchell has now satisfied the required

administrative waiting period and the CDC expanded its criteria for individuals who classify as highly susceptible to COVID-19 complications. [ECF No. 75]

## II.     BACKGROUND

On April 12, 2018, the Court sentenced Mitchell to serve 34 months for conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, illegal credit card possession and usage, in violation of 18 U.S.C. § 1029(a)(1) and identity theft, in violation of 18 U.S.C. § 1028A(A)(1). Judge Roberts, also from this district, sentenced Mitchell to 32 months' imprisonment for the same offenses. Mitchell is serving both sentences concurrently. Mitchell's Indictment [ECF No.1] specifies that she participated in a fraudulent scheme to produce, possess, and use counterfeit identification and credit cards. Mitchell's criminal behavior also included the attempted use of another individual's driver's license without their knowledge and consent.

Mitchell is twenty-four years old and suffers from obesity. [ECF No. 67] Mitchell will be eligible for release to home confinement in December 2020. [ECF No. 65, Pg.ID 456] Mitchell's release date from custody is scheduled for May 12, 2021. [ECF No. 61, Pg.ID 258]

Mitchell seeks early release from her term of imprisonment, citing concerns about the conditions at FCI Danbury specifically and its prevalence of COVID-19 infections and fatalities. *See* [ECF No. 65]; *see also United States v. Sedge*, No. 16-

CR-537(KAM), 2020 WL 2475071, at *3 (E.D.N.Y. May 13, 2020) (noting "[i]t is clear from the spread of the infection, the A.G.'s memo, and the tragic death of an inmate, that at the present time FCI Danbury has experienced difficulty containing COVID-19").

For the reasons that follow, the Court will **GRANT** Mitchell's Motion. [ECF No. 56; ECF No. 61]

## III.   LEGAL ANALYSIS

Prior to 2018, only the Bureau of Prisons could move for the compassionate release of criminal defendants. Then the First Step Act of 2018 amended 18 U.S.C. § 3582(c)(1)(A) to allow defendants to move for compassionate release. *See* Pub. L. 115-391, Sec. 603(b)(1). But this amendment did not create an unrestricted ability to file for compassionate release; the statute provides that defendants may file such a motion only if certain conditions are met:

(c) Modification of an imposed term of imprisonment.—The court may not modify a term of imprisonment once it has been imposed except that—

(1) in any case—

(A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of

probation or supervised release with or without conditions that
does not exceed the unserved portion of the original term of
imprisonment), after considering the factors set forth in section
3553(a) to the extent that they are applicable, if it finds that—

    (i) extraordinary and compelling reasons warrant such a
reduction; or

    (ii) the defendant is at least 70 years of age, has served at least
30 years in prison, pursuant to a sentence imposed under
section 3559(c), for the offense or offenses for which the
defendant is currently imprisoned, and a determination has been
made by the Director of the Bureau of Prisons that the
defendant is not a danger to the safety of any other person or
the community, as provided under section 3142(g);

    and that such a reduction is consistent with applicable policy
statements issued by the Sentencing Commission;

18 U.S.C. § 3582(c). Specifically, a criminal defendant may file a motion for

compassionate release only if one of two things have happened: (1) she has

exhausted all administrative rights to appeal the BOP's failure to bring a motion on

her behalf, or (2) 30 days have passed since the warden of her facility received her

request for the BOP to file a motion on her behalf.

In *United States v. Alam*, the Sixth Circuit recently held that the 30-day

waiting period is mandatory and that courts cannot waive it. 960 F.3d 831, 834 (6th

Cir. 2020) ("The language Congress used is quite mandatory . . . [i]t says a 'court

may not' grant relief without complying with the exhaustion requirement.")

(quoting 18 U.S.C. § 3582(c)). The Court is now bound by *Alam* and cannot waive

the administrative exhaustion process or statutory waiting period.

Here, the first condition was not met when Mitchell first filed her Motion in April. Mitchell has now provided information that she requested home confinement and that she was denied. [ECF No. 75-1, Pg.ID 601] According to Mitchell's supplemental documents, she submitted an official request to the BOP on May 15, 2020. [*Id.*] Explaining that Mitchell did have a medical condition to justify release, the BOP denied Mitchell's request on June 1, 2020. [*Id.* at 603]

This Court acknowledges that the Sixth Circuit opined in *Alam* that defendants should refile their requests to avoid ruling on "stale motions." *Alam*, 960 F.3d at 836 ("If (rather than dismissing) we sat on untimely compassionate release motions until the 30-day window ran its course, we could end up reviewing stale motions."). However, this Court finds that Mitchell filed her motion prior to *Alam's* ruling and that her 30-day waiting period expired while this Court was reviewing the instant Motion. The Court further notes that both Mitchell and the Government briefed this Motion on the merits. For the reasons mentioned above, the Court finds that Mitchell has satisfied her administrative requirements and the Court can evaluate this Motion on the merits.

## A. Extraordinary and Compelling Reasons

Inmates seeking compassionate release must demonstrate that "extraordinary and compelling reasons" exist to warrant a reduction in sentence. 18 U.S.C. § 3582(c). The Sentencing Commission has provided guidance about what

constitutes "extraordinary and compelling reasons" in Section 1B1.13 of the

Sentencing Guidelines. U.S.S.G. § 1B1.13. These reasons are classified in four

categories: (1) the defendant's medical condition; (2) the defendant's age; (3)

family circumstances, and (4) additional reasons "other than, or in combination

with" the first three elements. *Id.* at cmt. n.1(A)-(D).

Citing the Sentencing Commission's policy statement USSG § 1B1.13, the

Government argues that the criteria for home confinement is unambiguous and that

Mitchell does not qualify. 18 U.S.C. § 3582(c)(1)(A); *United States v. Saldana*,

2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020). The Government further

asserts that releasing Mitchell to home confinement is inconsistent with the factors

contained in 18 U.S.C. § 3553(a). Mitchell argues that she satisfies the medical

condition and other reasons categories of the policy.

### 1. Medical Condition

A defendant's medical condition may provide an extraordinary and

compelling reason under § 1B1.13 n.1(A)(ii) if a defendant suffers from a chronic

medical condition that the CDC has recognized as elevating the risk of becoming

seriously ill from COVID-19. § 1B1.13 n.1(A)(ii); *see also Groups at Higher Risk

for Severe Illness*, Centers for Disease Control,

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-

higher-risk.html (last visited May2 6, 2020). A court could find that defendant's

medical condition, heightened by risks posed by COVID-19, "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility" and is one "from which he or she is not expected to recover," i.e. a chronic condition. § 1B1.13 n.1(A)(ii).

Mitchell has established that she has a medical condition that places her in a higher risk category for COVID-19 complications. Mitchell cites her medical records in support of her contention that she has a body mass index ("BMI") between 31-32. [ECF No. 67, Pg.ID 547] According to Mitchell, a BMI above 29.9 categorizes an individual as "obese." [*Id.*] The CDC has revised its criteria, and individuals with a BMI over 30 are now classified as vulnerable individuals. *See Groups at Higher Risk for Severe Illness*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html (last visited July 2, 2020).

Mitchell also cites a study illustrating that although she is young, she is still at risk of developing complications from COVID-19. *See* Jennifer Lighter, *et al.*, *Obesity in Patients Younger than 60 Years is a Risk Factor for COVID-19 Hospital Admission*, Clinical Infectious Diseases (Apr. 9, 2020),

https://academic.oup.com/cid/advance-article/doi/10.1093/cid/ciaa415/5818333

(last visited July 20, 2020). The study found that individuals younger than 60 years old, with a BMI between 30 and 34, were twice as likely to need acute medical care related to COVID-19 than those with a BMI lower than 30. *Id.* That same study revealed that individuals under 60 with BMIs between 30 and 34 were 1.8 times more likely to need intensive emergency care than those with BMIs lower than 30. *Id.*

### 2.  Other Factors

Mitchell further contends that in addition to her medical condition, the Court should grant her request because of the "dire situation at Danbury." [ECF No. 61, Pg.ID 267] Mitchell asserts that other courts have granted similar requests when defendants did not have a CDC approved underlying medical condition. *See United States v. Kelly*, No. 3:13-CR-59-CWR-LRA-2, 2020 WL 2104241 (S.D. Miss. May 1, 2020).

*Kelly* observed that "[y]oung persons are not immune" to COVID-19 and that "it has become increasingly apparent that the BOP . . . failed to control the outbreak at Oakdale I." *Id.* at *7. Mitchell contends that *Kelly* and her case are analogous because the BOP has also failed to control the pandemic at FCI Danbury. *See Martinez-Brooks v. Easter*, No. 3:20-CV-00569 (MPS), 2020 WL 2405350, at *20 (D. Conn. May 12, 2020) ("FCI Danbury [is] one of three federal

prisons experiencing 'significant levels of infection.'") (internal citations omitted); *see also Sedge*, 2020 WL 2475071, at *3.

In Response, the Government asserts that the BOP has implemented effective protocols to curb the spread of COVID-19 and protect inmates. Citing the BOP's revised operations protocol, the Government states that the BOP now confines inmates to their cells or quarters for at least 14 days to stop the spread of COVID-19. [ECF No. 62, Pg.ID 292] Other protocols include limiting group gatherings and maximizing social distancing. [*Id.*] The BOP as has also begun distributing face masks to wear in public areas. *See BOP FAQs: Correcting Myths and Misinformation*,

https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf. To control the risk of asymptomatic transmission, BOP guidelines also instruct that newly admitted inmates be screened for COVID-19 risk factors and symptoms. [*Id.* at 292-293] Inmates that show signs of illness are evaluated, provided medical care, and are isolated until they test negative or are cleared by medical staff according to the CDC's criteria. [*Id.* at 293] Staff members displaying symptoms, such as an increased temperature above 100.4 degrees, are barred from the facility. [*Id.*]

The Government also outlines additional measures that the BOP has taken to control the spread of COVID-19. Contractors are only permitted into facilities if

they are performing essential services and must undergo a rigorous screening

process. [*Id.*] Social and legal visits have been suspended to limit the amount of

people that may carry COVID-19 into prison facilities. [*Id.*] To offset the

disruption caused by limiting visitors, the Government notes that the BOP has

increased inmates' telephone allowance to 500 minutes per month, for free. [*Id.*]

Essential legal services are also allowed on a case-by-case basis, permitted the

attorney shows no signs of infection. [*Id.*]

Despite these measures, Mitchell argues that the BOP has failed to contain

the spread of COVID-19 at FCI Danbury. Mitchell cites a staff complaint filed

with the Occupational Safety and Health Administration ("OSHA"), as evidence

that the BOP has failed to provide adequate protection in their facilities. *See* OSHA

Complaint,

https://www.afge.org/globalassets/documents/generalreports/coronavirus/4/osha-7-

form-national-complaint.pdf (detailing potential violations present at various BOP

facilities, including FCI Danbury). Mitchell also contends that a whistleblower

recently alleged that the conditions in BOP facilities are actually much worse than

the agency reports. *See* Keegan Hamilton, *Whistleblower Warned of Coronavirus*

*Danger in Prison Where a Woman Just Died After Giving Birth*, Vice News, (Apr.

29, 2020), https://www.vice.com/en_us/article/pke7z8/exclusive-whistleblower-

[warned-ofcoronavirus-danger-in-prison-where-a-woman-just-died-after-giving-birth](warned-ofcoronavirus-danger-in-prison-where-a-woman-just-died-after-giving-birth).

Here, Mitchell has established extraordinary and compelling reasons that justify granting her request. The first element of the Section 1B1.13 analysis, Mitchell's medical condition, is the most contested aspect of Mitchell's request. Although the only medical condition that Mitchell currently endures is obesity, [ECF No. 67, Pg.ID 546] the Court is persuaded by Mitchell's supplemental evidence that establishes that younger individuals and those with obesity are also vulnerable to COVID-19 complications. Mitchell further argues that courts may find "that extraordinary and compelling reasons exist based on facts and circumstances other than those set forth in U.S.S.G. § 1B1.12 . . . ." *See United States v. Redd*, No. 1:97-cr-0006-AJT, 2020 WL 1248493, at *8 (E.D. Va. Mar. 16, 2020*); see also United States v. Perez*, No. 88-10094- JTM, 2020 WL 1180719, at *2 (D. Kan. Mar. 11, 2020) (observing that many courts have noted their authority to exercise the same discretion as the BOP when determining motions for compassionate release); *see also United States v. Maumau*, No. 2:08-cr-0758-TC, 2020 WL 806121, at *3 (D. Utah Feb. 18, 2020) ("[C]ourts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement.") (citation and internal quotation marks

omitted)). The Court is persuaded that Mitchell has presented unique facts and circumstances that warrant relief.

Although the Government cites *Saldana* to argue that Defendant does not fit the criteria for release, the Government omits *Saldana's* language explaining that the BOP's list for "other reasons" is nonexclusive. *Saldana*, 2020 WL 1486892, at *2. The Government claims that COVID-19 should not alter the Court's analysis. To support this point, the Government cites the Third Circuit in *United States v. Raia*. 954 F.3d at 597 (finding that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread").

The Court appreciates the steps that the BOP has implemented to curb the spread of COVID-19, but the Government cites no specific evidence to counter Mitchell's specific concerns about FCI Danbury or the issues highlighted in *Martinez-Brooks*. The Government also fails to explain that one of the most effective methods for preventing the transmission of COVID-19 is social distancing. To reduce the spread of COVID-19, social distancing measures have

been recommended by the CDC and implemented by states across the nation.[1]

Persuaded by the factual findings in *Martinez-Brooks*, the Court finds that the

current layout and organization of FCI Danbury hinders proper social distancing

measures. *See Martinez-Brooks*, 2020 WL 2405350, at *23 ("Even with the

measures that the Warden has put in place, due to the impossibility of adequate

social distancing, confinement at FCI Danbury—due to the very structure of the

facility—continues to pose a grave risk to vulnerable inmates' health.").

### B. Other Considerations

The Government asserts that Mitchell is contesting the calculation of her

sentence and that the Court lacks jurisdiction to determine such a request. The

Government argues that sentencing calculation disputes—including a sentence

commencement date and any credit for time spent in custody before sentencing—

must be determined by the Attorney General through the BOP. *United States v.*

*Wilson*, 503 U.S. 329, 334–35 (1991) Citing 18 U.S.C. § 2241, the Government

argues that defendants challenging the manner in which their sentence is being

executed must file a petition in the district with jurisdiction over their custodian.

*Robinson v. Morrison*, 27 F. App'x 557 (6th Cir. 2001); *In re Gregory*, 181 F.3d

713, 714 (6th Cir. 1999).

---

[1] *See* Executive Order, No. 2020-21 (Mar. 24, 2020). rhttps://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-522626--,00.html.

In response, Mitchell argues that she only mentions the BOP's computation as part of the sentencing factors necessary for review of a compassionate release request, pursuant to 18 U.S.C. § 3553(a). Mitchell emphasizes that neither this Court nor Judge Roberts' expressed opposition to their sentences running concurrently and that the BOP should have noted this when evaluating Mitchell's sentence, or any subsequent sentencing requests.

The Court notes that Mitchell referred to a dispute between herself and the BOP regarding her PATTERN score. However, the Court finds that Mitchell referred to the disagreement about the PATTERN score computation as an example of why exhausting administrative remedies would have been futile. The Court also notes that Mitchell's additional assertion alleging a qualifying medical condition under 18 U.S.C. § 3582(c)(1)(A), gives the Court jurisdiction to determine the instant Motion. § 3582(c)(1)(A) (allowing a court to modify terms of imprisonment if extraordinary and compelling reasons are met).

The Government also argues that Mitchell's past criminal history weighs against granting release. The Government asserts that Mitchell has a pattern of deceiving the justice system, beginning in 2016. In 2016, while on probation for a larceny conviction, the Government states that Mitchell violated the Court's order four times. Mitchell twice failed to comply with her drug screening requirement— once refusing to take the test, and the other time testing positive for marijuana use.

[ECF No. 62, Pg.ID 286] The other two violations involved identity theft and illegal credit card usage and possession, which led to Mitchell's current incarceration. When a loss prevention officer detained Mitchell in 2017, she escaped and evaded arrest for six months. [*Id.* at 287] The Government also indicates that there are currently two warrants for her arrest for previous failures to appear. Mitchell counters that these warrants have been resolved.

The Government asserts that Mitchell has a pattern of deceptive behavior. During a detention hearing, Mitchell stated that her mother would be a third-party custodian. This assertion was untrue, and her mother had previously evicted her. [*Id.* at 289] Other examples of deceit the Government cites are a previous failure to appear for court and all of the underlying behavior accompanying her arrest and plea—lying to the court, maintaining multiple identities and false financial documents. [*Id.* at 288] The Government also cites to Mitchell's previous attempts to deceive the court to illustrate that she may take advantage of the pandemic to reengage in criminal behavior.

The Government also argues that the Court must be weary of Mitchell's past behavior and that if Mitchell is unable to rehabilitate, society will be endangered, and the Court's probation officers will not be able to adequately respond. The Government specifically contends that the Probation Department is overburdened and does not have the ability to tether everyone. The Government further asserts

that if Mitchell is released her past deception establishes that she could easily assume another identity and evade detection.

Mitchell responds by noting support from her mother and sister. Mitchell contends that her mother is aware of the supervised-release conditions that the Court would impose and that she is able to ensure Mitchell's compliance. [ECF No. 61-2, Pg.ID 275] Mitchell cites a letter written by her sister-in-law as evidence that she has used her time in prison wisely and has made positive strides. The letter explains that Mitchell has spent her time in custody to write children's books. Mitchell acknowledges that her familial support alone is not enough to satisfy the "extraordinary and compelling" reasons standard but argues that it rebuts any arguments that she may be unable to successfully rehabilitate and adjust outside of prison.  Having received zero disciplinary infractions in prison, the Court notes Mitchell's good behavior.

The Court finds that Mitchell's crime was egregious, but it was ultimately nonviolent. The Court also agrees that proper safeguards would ensure that Mitchell continues to serve her term to completion and comply with Court guidelines. The Court is not persuaded by the Government's argument that the Probation Department will be unable to monitor Mitchell. Although the Court must note her previous violations, including making dishonest statements to the Court during her detention hearing, relying on such past behavior *alone* does not warrant

denying Mitchell's motion. Mitchell's crime was nonviolent, she has shown progress in prison, and has a support system awaiting her return. Mitchell seems to have repaired her relationship with her mother and there is currently no dispute that she is willing to monitor her daughter.

The Court also notes that Mitchell is just shy of completing two-thirds of her total sentence on July 26, 2020. Even without the circumstances surrounding COVID-19, Mitchell would be eligible for home confinement on December 8, 2020.

### C. Conclusion

Prisoners have a right to "receive adequate food, clothing, shelter, and medical care," and prisons must "take reasonable measure to guarantee the safety of the inmates". *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal citations and quotations omitted). "[H]aving stripped [incarcerated persons] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Id.* at 833.

It is "undisputed that there is an active and serious outbreak of COVID-19 at FCI Danbury." *Martinez-Brooks*, 2020 WL 2405350 at *20. One FCI Danbury inmate,[2] Anthony David Gentile, has tragically died from COVID-19. It is evident

---

[2] Although this death occurred at the men's facility, the outbreak has infiltrated both the men and women's facilities.

from the spread of infection, the A.G's memorandum, the concern from U.S. senators, and the tragic death of an inmate, that FCI Danbury is currently having difficulty containing COVID-19 and that prisoners with particular medical conditions are likely to be more susceptible to developing serious complications from COVID-19.

BOP directives require the BOP to identify the inmates most at risk from COVID-19 and "to consider the totality of circumstances for each individual inmate" in deciding whether home confinement is appropriate. (03-26-2020 Directive to BOP, at 1). The Court has taken a similar approach and considered the totality of Mitchell's case.

After weighing Mitchell's past behavior with the risks posed to her by six more months at FCI Danbury the Court finds that denying Mitchell's request and holding her until December would not further the legitimate goals of incarceration, such as "retribution, deterrence, incapacitation, and rehabilitation." *Graham v. Florida*, 560 U.S. 48, 71 (2010). It is the Court's role to balance justice with mercy, and relying solely on Mitchell's past behavior when she has demonstrated a heightened health risk would complicate that role. *See Walker v. Martel*, 709 F.3d 925, 950 (9th Cir. 2013) (Gould, J., concurring in part and dissenting in part) ("[M]ercy bears richer fruits than strict justice.") (internal quotations omitted)).

The Court reduces Mitchell's term of imprisonment portion of her sentence to time served, and the Court imposes a term of supervised release equal to the unserved portion of her original term of imprisonment (as calculated by the BOP). Unless Mitchell has been in a segregated special unit for high-risk prisoners for more than 14 days where no inmate has tested positive or shown symptoms of COVID-19 within the past 14 days, the Court orders Mitchell to self-quarantine within her home when she begins home confinement. Mitchell shall serve the new term of supervised release under home confinement, with electronic location monitoring to commence as soon as the Probation Department can safely install the necessary electronic monitoring equipment and upon such other conditions as the Probation Department deems necessary.

Accordingly,

IT IS ORDERED that Defendant's Emergency Motion for Immediate Reduction of Sentence (Compassionate Release) [ECF No. 56] is **GRANTED**.

IT IS FURTHER ORDERED that Defendant's sentence of imprisonment is reduced to time served.

IT IS FURTHER ORDERED that the BOP shall release Defendant immediately, without holding for a 14-day quarantine period at FCI Danbury, and Defendant shall remain self-quarantined for 14 days after release.

IT IS FURTHER ORDERED that, upon release, Defendant shall commence a new term of supervised release that is equal to the unserved portion of her original term of imprisonment (as calculated by the BOP).

IT IS FURTHER ORDERED that Defendant shall serve the new term of supervised release under home confinement, with electronic location monitoring to commence as soon as the Probation Department can safely install the necessary electronic monitoring equipment and upon such other conditions as the Probation Department deems necessary.

IT IS FURTHER ORDERED that, within 24 hours of release from BOP custody, Defendant shall call the Probation Department to schedule an appointment.

IT IS FURTHER ORDERED that Defendant's original term of supervised release is canceled.

IT IS ORDERED.

s/Denise Page Hood
Dated:  July 27, 2020                    Chief Judge, United States District